1

2  AZRA MEHDI (SBN 220406)
   azram@themehdifirm.com
3  The Mehdi Firm, PC
   201 Mission Street, Suite 1200
4  San Francisco, CA 94105
   Phone: 415.293.8039
5  Facsimile: 415.432.4301

6  Attorney for Plaintiff

7  [additional counsel appears on signature page]

8

9               IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
10                  SAN FRANCISCO DIVISION

11

12  CORI B. TARATOOT, Derivatively on Behalf        Civil File Action
    of NETFLIX, INC.,

13                                                   No. _____
        Plaintiff,

14                                                   **JURY TRIAL DEMANDED**
    v.

15
    RICHARD BARTON, RODOLPHE BELMER,
16  MATHIAS DÖPFNER, TIMOTHY HALEY,
    REED HASTINGS, DAVID HYMAN, JAY
17  HOAG, LESLIE KILGORE, STRIVE
    MASIYIWA, ANN MATHER, SPENCER
18  NEUMANN, GARY PETERS, TED
    SARANDOS, BRAD SMITH, and ANNE
19  SWEENEY

20

21      Defendants,

22  – and –

23  NETFLIX, INC., a Delaware Corporation,

24      Nominal Defendant.

25

26                                                   VERIFIED STOCKHOLDER
                                                     DERIVATIVE COMPLAINT
27

28
                                                     VERIFIED STOCKHOLDER
                                                     DERIVATIVE COMPLAINT

Plaintiff Cori B. Taratoot ("Plaintiff"), a citizen of Oregon, by her attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge.

## I.      INTRODUCTION

1.      This is a stockholder derivative action brought on behalf of and for the benefit of Netflix, Inc. ("Netflix" or the "Company"), against certain of its current and former officers and directors, seeking to remedy their breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.  Defendants' actions, as set forth more fully herein, have caused substantial financial and reputational harm to Netflix.

2.      Netflix is the world's leading streaming entertainment subscription-based service company.  Netflix creates and distributes television series, documentaries, feature films and other entertainment on its streaming platform and allows its members to watch these programs without commercials on an internet-connected device.

3.      As a direct result of Defendants' unlawful course of conduct described herein, the Company misled the investing public about its business, operations, and prospects.  Consequently, when the true facts were finally revealed to the public, as set forth below, the stock price of Netflix was significantly impacted, losing over $110 per share on January 21, 2022 and over $122 per share on April 20, 2022, both on unusually heavy volume.  Moreover, Netflix and Defendants Reed Hastings, Theodore Sarandos Spencer Neumann and Gregory Peters are now the subject of securities class action litigation in this same District, styled:  *Cleveland Bakers and Teamsters Pension Fund v. Netflix Inc., Reed Hastings, Theodore Sarandos, Spencer Neumann and Gregory Peters,* Case No. 4:22-cv-03164 (the "Securities Class Action").  The Securities Class Action sets forth claims on behalf of Netflix shareholders, asserting that the defendants in that action: (i) failed

to disclose to investors that account sharing by customers and increased competition from other streaming services were creating significant challenges to Netflix; (ii) the Company was experiencing difficulty retaining customers; (iii) as a result of the aforementioned, (a) the Company's growth was decelerating, (b) the Company's financial results were being adversely affected, and (c) the defendants' positive statements about the Company's business, operations and prospects were materially false and/or misleading and/or lacked a reasonable basis. Through the Securities Class Action, the plaintiffs therein assert that, as a result of the aforementioned wrongful actions and the precipitous declines in the price of the Company's securities, the plaintiffs and other class members suffered significant losses and damages.

4.      Netflix and Defendants Hastings, Sarandos, and Neumann are also the subject of another similar securities class action litigation in this same District, styled: *Pirani v. Netflix, Inc., Reed Hastings, Ted Sarandos, and Spencer Neumann*, Case No. 4:22-cv-2672.

5.      Despite their knowledge of the facts and information that had an adverse impact on the Company's business, operations and outlook and that the Company's SEC filings did not reflect the aforementioned adverse facts and information, and knowing that the Netflix stock was trading at an artificially inflated price as a result, several of the Defendants here, utilizing their knowledge of facts not publicly known, sold significant amounts of their personally held shares of Netflix, Inc. stock.

6.      Defendants here now face liability to the Company for their multiple breaches of their fiduciary duties to the Company by, *inter alia*, (i) affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings relating to the Company's business, operations and prospects; (ii) failing to maintain adequate controls regarding the Company's reporting; (iii) trading in the stock of the Company based on their knowledge of the events described herein; and (iv) such other and further actions described herein.

7.      Due to the Netflix Board of Directors' (the "Board") knowledge and involvement in the wrongdoing, its blatant failure to act, its members' lack of independence, and the substantial likelihood of liability its members face, any demand upon the Board to rectify this wrongdoing would be a wasteful and useless act.  Accordingly, Plaintiff brings this action to remedy the harm to Netflix caused by Defendants' faithless actions.

## II.      JURISDICTION AND VENUE

8.      This Court has jurisdiction under 28 U.S.C. § 1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      This Court has jurisdiction over each named Defendant.

10.      Additionally, this Court has specific jurisdiction over each named Defendant herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

11.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 because: (i) Netflix maintains executive offices in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Netflix occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### III.    THE PARTIES

#### A.    Plaintiff

12.    Plaintiff Cori B. Taratoot was stockholder of Netflix at the time of wrongdoing complained of, has continuously been a stockholder since that time, and is a current Netflix stockholder.

13.    Plaintiff is a citizen of Oregon.

#### B.    Nominal Defendant

14.    Nominal Defendant Netflix.com, Inc. is a publicly-traded Delaware corporation with its principal executive offices located at 100 Winchester Circle, Los Gatos, California 95032.

15.    The Company's common stock trades on the NASDAQ under the ticker symbol "NFLX." Netflix has over 425 million shares of common stock outstanding.

#### C.    Defendants

16.    Defendant Reed Hastings (Hastings) is the Co-Chief Executive Officer ("Co-CEO") and President of the Company.

17.    Defendant Hastings is also the co-founder of Netflix. He has been a Director and the Chairperson of the Company since 1997.

18.    Upon information and belief, Defendant Hastings is a citizen of the state of California.

19.    Netflix has paid Defendant Hastings compensation totaling $34,650,000.00 in 2021 and $33,000,000.00 in 2020.

20.    Defendant Ted Sarandos ("Sarandos") is the Co-CEO and Chief Content Creator of the Company.

21.    Defendant Sarandos has been a Director of Netflix since 2020.  Defendant Sarandos also has served on one or more other public company boards.

22. Upon information and belief, Defendant Sarandos is a citizen of the state of California.

23. Netflix has paid Defendant Sarandos compensation totaling $34,650,000.00 in 2021 and $33,000,000.00 in 2020.

24. Defendant Spencer Neumann ("Neumann") is the Company's Chief Financial Officer ("CFO").

25. Upon information and belief, Defendant Neumann is a citizen of the state of California.

26. Netflix has paid Neumann compensation totaling $11,550,000.00 in 2021 and $11,000,000.00 in 2020.

27. Defendant Gregory Peters ("Peters") is the Company's Chief Operating Officer and Chief Product Officer.

28. Upon information and belief, Defendant Peters is a citizen of the state of California.

29. In 2021 and 2020, Netflix paid Defendant Peters compensation totaling $18,900,000.00 and $18,000,000.00, respectively.

30. Defendant David Hyman ("Hyman") is the Company's Secretary and Chief Legal Officer.

31. Upon information and belief, Defendant Hyman is a citizen of the state of California.

32. Netflix has paid Defendant Hyman compensation totaling $9,450,000.00 in 2021 and $9,000,000.00 in 2020.

33. Defendant Jay Hoag ("Hoag") is a Director of Netflix.

34.     Defendant Hoag has been a Director of Netflix since 1999.  Defendant Hoag is a venture capital investor and has served on one or more other public boards.

35.     Upon information and belief, Defendant Hoag is a citizen of the state of California.

36.     Defendant Ann Mather ("Mather") is a Director of Netflix.

37.     Defendant Mather has been a Director of Netflix since 2015.  She also has held senior positions with large entertainment companies and has served on one or more other public company boards.

38.      Upon information and belief, Defendant Mather is a citizen of the state of California.

39.     Defendant Timothy Haley ("Haley") is a Director of Netflix.

40.     Defendant Haley has been a Director of Netflix since 1998.  He is a venture capital investor and has served on one or more other public company boards.

41.     Upon information and belief, Defendant Haley is a citizen of the state of California.

42.     Defendant Leslie Kilgore ("Kilgore") is a Director of Netflix.

43.     Defendant Kilgore has been a Director of Netflix since 1998.  She is the former Chief Marketing Officer of Netflix and has served on one or more other public company boards.

44.     Upon information and belief, Defendant Kilgore is a citizen of the state of California.

45.     Defendant Strive Masiyiwa ("Masiyiwa") is a Director of Netflix.

46.     Defendant Masiyiwa has been a Director of Netflix since 2020, is a telecommunications company founder and has served on one or more other public company boards.

47.     Upon information and belief, Defendant Masiyiwa resides in the United Kingdom.

48.     Defendant Richard Barton ("Barton") is a Director of Netflix.

49.     Defendant Barton has been a Director of Netflix since 2002, founded several internet-based companies and has served on one or more other public company boards.

50.     Upon information and belief, Defendant Barton is a citizen of the state of Washington.

51.     Defendant Rodolphe Belmer ("Belmer") is a Director of Netflix.

52.     Defendant Belmer has been a Director of Netflix since 2018 and is a media executive and has been the CEO and/or director of several other companies.

53.     Upon information and belief, Defendant Belmer is a citizen of France.

54.     Defendant Mathias Döpfner ("Döpfner") is a Director of Netflix.

55.     Defendant Döpfner has been a Director of Netflix since 2018, has media company experience and currently is the Chairman and CEO of a digital publishing house.  He also has served on one or more other public company boards.

56.     Upon information and belief, Defendant Döpfner is a citizen of Germany.

57.     Defendant Brad Smith ("Smith") is a Director of Netflix.

58.     Defendant Smith has been a Director of Netflix since 2015, is the President and Vice Chair of Microsoft, is a lawyer and is a former Partner of Covington and Burling, a multi-national law firm.

59.     Upon information and belief, Defendant Smith is a citizen of the state of Washington.

60.     The Netflix Board of Directors does not receive cash for services they provide as directors or members of Board committees.  Each non-employee director receives stock options pursuant to the Director Equity Compensation Plan. The Company's Director Equity Compensation Plan provides for a monthly grant of stock options to each non-employee director of the Company

in consideration for services provided to Netflix and subject to the terms and conditions of the Company's equity compensation plans.

61.    The number of options granted each month to each of Netflix's directors is determined by the following formula:  $25,000 / ([fair market value on the date of grant] x 0.40).  Each monthly grant is made on the first trading day of the month, is fully vested upon grant, and is exercisable at a strike price equal to the fair market value on the date of grant.

**D.    Netflix Board Committees**

62.    Most of Netflix's Board members serves on one of three committees.

63.    In 2021, the Board members who served on each committee were as follows:

| Name | Committee | Role |
|---|---|---|
| Richard Barton | Audit | Member |
| Leslie Kilgore | Audit | Member |
| Ann Mather | Audit | Chair |
| Rodolphe Belmer | Compensation | Member |
| Mathias Döpfner | Compensation | Member |
| Timothy Haley | Compensation | Chair |
| Anne Sweeney | Compensation | Member |
| Jay Hoag | Nominating and Governance | Chair |
| Brad Smith | Nominating and Governance | Member |

64. In 2022, the Board members who served on each committee were as follows:

| Name | Committee | Role |
|---|---|---|
| Richard Barton | Audit | Member |
| Leslie Kilgore | Audit | Member |
| Ann Mather | Audit | Chair |
| Rodolphe Belmer | Compensation | Member |
| Mathias Döpfner | Compensation | Member |
| Timothy Haley | Compensation | Chair |
| Anne Sweeney | Compensation | Member |
| Jay Hoag | Nominating and Governance | Chair |
| Strive Masiyiwa | Nominating and Governance | Member |
| Brad Smith | Nominating and Governance | Member |

65. Defendants Barton, Belmer, Döpfner, Haley, Hastings, Hyman, Hoag, Kilgore, Masiyiwa, Mather, Neumann, Peters, Sarandos, Smith, and Sweeney shall be referred to herein as the "Individual Defendants." Defendants Hastings, Hyman, Neumann, Peters, and Sarandos collectively shall be referred to herein as the "Officer Defendants." Defendants Barton, Kilgore and Mather collectively shall be referred to herein as the "Audit Committee Defendants." Defendants Belmer, Döpfner, Haley, Sweeney collectively shall be referred to herein as the "Compensation Defendants." Defendants Hoag, Masiyiwa and Smith collectively shall be referred to herein as the "Nominating and Governance Defendants." Defendants Barton, Belmer, Döpfner, Haley, Hoag, Kilgore, Masiyiwa, Mather and Smith collectively shall be referred to herein as the "Outside Director Defendants."

66. Defendants Peters, Hoag, Mather, Sarandos, and Hyman are referred to herein as the "Insider Selling Defendants."

**IV.        DEFENDANTS' MISCONDUCT**

**A.        Company Background**

67.        Founded in 1997, Netflix is now the largest streaming entertainment service in the world.   It offers a vast catalogue, including movies, television shows, original content and gaming.

68.        Originally a DVD mail order rental company, Netflix quickly moved from a per DVD rental model to a subscription service.  In 2007, the Company lunched its streaming media service.  A month after launching the streaming service, Netflix had delivered over a billion DVDs to customers.  While Netflix still has a DVD subscription arm, its principal business is in streaming services.

69.        From 2007 to 2022, Netflix significantly expanded in terms of programming, which now includes previously released movies and television programs, the Company's own original content and gaming.   As of December 2021, Netflix had over 200 million paying subscriber households, in at least 190 countries, and had over 15,000 different titles globally which could be streamed.  Because of its extensive content and ease of use, Netflix is regularly touted by consumer magazines as the best streaming service to use. According to Netflix, it "redefined how people watch video entertainment." 2022 Proxy Statement at 22.

**B.        Netflix's Customer Base**

70.        Netflix's financial success is dependent upon keeping existing customers signed on to its subscription streaming service and expanding its subscriber base.  Indeed, in its 2020 10k, Netflix states, "Our core strategy is to grow our streaming membership business globally within the parameters of our operating margin target.   We are continuously improving our members' experience by expanding our content with a focus on a programming mix of content that delights our customers and attracts new members."  Netflix 2020 10-K at 4.

71.     According to its 2020 10-K at 21, Netflix had approximately 89 million subscribers in 2016.  It increased its subscribers to 110 million in 2017.  In 2018, Netflix had over 139 million subscribers.  The Company continued that steady growth in 2019 with 167 million subscribers.

72.     In 2020, the worldwide Covid-19 pandemic abruptly and significantly changed the way that consumers worldwide were willing and able to access entertainment. As most countries put restrictions on what kinds of businesses could remain open and could be frequented by customers, and as consumers of movie theaters and other outside of the home entertainment options significantly restricted their own movement because of the pandemic, home entertainment consumption markedly increased.

73.     During 2020, when the pandemic closures were at their height, Netflix gained a record 37 million customers, representing a 31% increase from 2019's paid net additional subscribers for a total of over 203 million.  Netflix 2020 10-K at 21.

74.     In January 2021, the Company reported its fourth quarter 2020 financial results, noting that paid streaming memberships increased over 23% over the prior year, with revenue 1% higher than forecasted.

75.     In its April 2021 filings, Netflix noted: "The extraordinary events of Covid-19 led to unprecedented membership grown in 2020... we ended 2020 with a bigger membership and revenue base than we would otherwise have had, contributing to record Q1'21 revenues."  Netflix 2020 8-K at 2. Even though countries were opening up and fewer people were getting their entertainment solely in their homes, and notwithstanding new streaming having launched and other expanding their customer base, Neumann assured investors that the "business remains healthy" despite "noise in the near term."  On the April 20, 2021 earnings call, Neumann stated that while the environment had become more competitive, he did not express any concern about Netflix's prospects, noting that the industry is "intensely competitive, but it always has been."

76.     That previous month, March 2021, Netflix Board of Directors authorized the repurchase of up to $5 billion of our common stock, with no expiration date for that repurchase (the "Stock Repurchase Program"). Netflix 2021 10-K at 56.

77.     On July 20, 2021, when Netflix announced its second quarter 2021 financial results, Neumann continued to be optimistic about Netflix's prospects, notwithstanding the "choppiness" in growth due to the after-effect of the "big pull forward in 2020." He assured investors that the "business is performing well."

78.     October 19, 2021, Netflix announced its third quarter 2021 financial results in a letter to the shareholders. In the call to discuss the financial results with analysts and investors, Neumann stated that "the business remained healthy as it had been throughout the year" and that management "expect[ed] to continue in terms of that healthy retention and then this kind of acceleration as we get past those initial market reopenings with COVID [and] past the COVID pull forwarding into the strength of our slate."

79.     Between March 2021 and December 31, 2021, the Company had repurchased 1,182,410 shares of common stock for an aggregate amount of $600 million pursuant to the Stock Repurchase Program. Netflix 2021 10-K at 56.

C. **The Truth is Revealed**

80.     On January 20, 2022, after the markets closed, Netflix finally disclosed that it had "slightly over-forecasted paid net adds in Q4." In a letter to shareholders, Netflix announced:

> We slightly over-forecasted paid net adds in Q4 (8.3m actual compared to the 8.5m paid net adds in both the year ago quarter and our beginning of quarter projection). For the full year 2021, paid net adds totaled 18m vs 37m in 2020. Our service continues to grow globally, with more than 90% of our paid net adds in 2021 coming from outside the UCAN region. Nonetheless, our UCAN region added 1.2m paid memberships in Q4'21 (vs. 0.9m last year), marking our strongest quarter of member growth in this region since the early days of COVID-19 in 2020. In APAC, we increased paid memberships by 2.6m (vs. 2.0m in the year ago quarter) with strong

growth in both Japan and India. EMEA was our largest contributor to paid net adds in Q4 (3.5m vs. 4.5m in the prior year period) and the region delivered record quarterly revenue, exceeding $2.5 billion for the first time. LATAM paid net adds totaled 1.0m vs. 1.2m last year. * * * For Q1'22, we forecast paid net adds of 2.5m vs. 4.0m in the year ago quarter. Our guidance reflects a more backend weighted content slate in Q1'22 (for example, Bridgerton S2 and our new original film The Adam Project will both be launching in March). In addition, while retention and engagement remain healthy, acquisition growth has not yet re-accelerated to pre-Covid levels. We think this may be due to several factors including the ongoing Covid overhang and macro-economic hardship in several parts of the world like LATAM.

81.    Further, Netflix stated that "competition intensified over the last 24 months as entertainment companies all around the world develop[ed] their own streaming offerings." Netflix touted its growth "in every country and region in which these new streaming alternatives have launched" but noted that "this added competition may be affecting our marginal growth some."

82.    The next day after this belated disclosure, the Company's stock price fell $100.75 per share, closing at $397.50 per share in unusually heavy volume.

83.    Netflix held a conference call that same day to discuss the financial results with analysts and investors. Defendant Neumann stated during that call that "overall, the business was healthy. Retention was strong. Churn was down." He further stated that "acquisition was growing, just not growing quite as fast as we were perhaps hoping or forecasting," which was "probably a bit of just overall COVID overhang that's still happening . . . [and] some macroeconomic strain in some parts of the world."

84.    On January 27, 2022, Netflix filed with the SEC on Form 10-K its annual report for the period ended December 31, 2021. Therein, the Company provided the following risk disclosures:

If our efforts to attract and retain members are not successful, our business will be adversely affected. We have experienced significant membership growth over the past several years. Our penetration and growth rates vary between the jurisdictions where we provide our service. In countries where

we have been operating for many years or where we are highly penetrated, our membership growth is slower than in newer or less penetrated countries. Our ability to continue to attract and retain members will depend in part on our ability to consistently provide our members in countries around the globe with compelling content choices, effectively drive conversation around our content and service, as well as provide a quality experience for choosing and enjoying TV series, documentaries, feature films and mobile games. Furthermore, the relative service levels, content offerings, pricing and related features of competitors to our service may adversely impact our ability to attract and retain memberships. Competitors include other entertainment video providers, such as MVPDs, and streaming entertainment providers (including those that provide pirated content), video gaming providers, as well as user-generated content, and more broadly other sources of entertainment that our members could choose in their moments of free time.

If consumers do not perceive our service offering to be of value, including if we introduce new or adjust existing features, adjust pricing or service offerings, or change the mix of content in a manner that is not favorably received by them, we may not be able to attract and retain members. We have recently expanded our entertainment video offering to include games. If our efforts to develop and offer games are not valued by our current and future members, our ability to attract and retain members may be negatively impacted. We may, from time to time, adjust our membership pricing, our membership plans, or our pricing model itself, which may not be well-received by consumers, and which may result in existing members canceling our service or fewer new members joining our service. In addition, many of our members rejoin our service or originate from word-of-mouth advertising from existing members. If our efforts to satisfy our existing members are not successful, we may not be able to attract members, and as a result, our ability to maintain and/or grow our business will be adversely affected. Members cancel our service for many reasons, including a perception that they do not use the service sufficiently, the need to cut household expenses, availability of content is unsatisfactory, competitive services provide a better value or experience and customer service issues are not satisfactorily resolved. Membership growth is also impacted by seasonality, with the fourth quarter historically representing our greatest growth, as well as the timing of our content release schedules. We must continually add new memberships both to replace canceled memberships and to grow our business beyond our current membership base. While we currently permit multiple users within the same household to share a single account for non-commercial purposes, if multi-household usage is abused or if our efforts to restrict multi-household usage are ineffective, our ability to add new members may be hindered and our results of operations may be adversely impacted. If we do not grow as expected, given, in particular, that our content costs are largely fixed in nature and contracted over several years, we may not be able to adjust our expenditures or increase our (per membership) revenues commensurate with the lowered growth rate such

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
15

that our margins, liquidity and results of operation may be adversely impacted. If we are unable to successfully compete with current and new competitors in providing compelling content, retaining our existing memberships and attracting new memberships, our business will be adversely affected.

85.    On April 19, 2022, after the market closed, Netflix reported that it has lost over 200,000 subscriptions during the first quarter of 2022 instead of acquiring the projected 2.5 million new subscriptions and the four million in the first quarter of 2021.  Netflix was losing subscribers, rather than gaining them as it had projected.

86.    In addition, Netflix told its shareholders in an April 19, 2022 letter that it was "not growing revenue as fast as we'd like."  While Netflix stated that "COVID clouded the picture by significantly increasing our growth in 2020, leading us to believe that most of our slowing growth in 2021 was due to the COVID pull forward,"  Netflix's slowing revenue was due to four factors:

1.    The uptake of connected TVs, the adoption of on-demand entertainment, and data costs;

2.    Netflix passwords being shared with over **100m additional households**, including over 30m in the United States and Canada;

3.    Competition for viewing "as traditional entertainment companies realized streaming is the future, many new streaming services have also launched"; and

4.    Macro factors, including sluggish economic growth, inflation, geopolitical events, and continued COVID disruptions.

87.    Through these disclosures, Netflix revealed that it had lost subscribers for the first time in more than 10 years.  The results and weak outlook led to a wave of downgrades from Wall Street on fears over the Company's long-term growth potential.

88.    On this news, on April 20, 2022, Netflix's share price fell $122.42, or over 35%, to close at $226.19 per share on unusually heavy volume.

89.    On April 20, 2022, CNBC described Netflix's as "the worst-performing stock of 2022 in the S&P 500, down 62.5% year-to-date."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

16

**D. Insider Trading**

90.     While many of Netflix's shareholders lost considerable sums with the shares declining over 62% at one point, many of the Netflix insiders were able to sell their shares at artificially high prices and avoid the staggering losses suffered by the Company's other shareholders.  During 2021, as Netflix was touting its growth and positive financial forecast, certain corporate insiders elected to sell certain of their shares of Netflix stock.

91.     For example, the following chart reflects insider transactions during this time period:

| Name | Date | Number of Shares Sold | Average Price Sold | Total Value of Shares Sold |
|---|---|---|---|---|
| Gregory K Peters | 11/17/2021 | 7,058 | $700.00 | $4,940,600.00 |
| Jay C Hoag | 11/17/2021 | 2,472 | $700.19 | $1,730,869.68 |
| Jay C Hoag | 11/5/2021 | 7,212 | $654.51 | $4,720,326.12 |
| Gregory K Peters | 10/25/2021 | 6,721 | $675.00 | $4,536,675.00 |
| Gregory K Peters | 10/21/2021 | 7,329 | $650.00 | $4,763,850.00 |
| David A Hyman | 10/4/2021 | 18,116 | $620.00 | $11,231,920.00 |
| Gregory K Peters | 10/4/2021 | 6,455 | $625.00 | $4,034,375.00 |
| Theodore A Sarandos | 10/4/2021 | 69,707 | $625.00 | $43,566,875.00 |
| Ann Mather | 9/7/2021 | 809 | $600.00 | $485,400.00 |
| Gregory K Peters | 9/7/2021 | 6,941 | $600.00 | $4,164,600.00 |
| Jay C Hoag | 8/11/2021 | 8,960 | $513.41 | $4,600,153.60 |

92.     As a result of the false and misleading disclosures and failures to disclose as set forth above, these insider stock sales conducted by the Insider Defendants occurred at artificially

inflated share prices not truly reflective of the Company's value, which the Insider Defendants knew when they were making those sales.

## V.      DEFENDANTS' DUTIES

### A.      Defendants' Fiduciary Duties

93.      By reason of their positions as officers and/or directors of Netflix, and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner.  Each Individual Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of his or her personal interest or benefit.

94.      Because of their positions of control and authority as officers and/or directors of Netflix, Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Netflix, each Defendant had knowledge of material, nonpublic information regarding the Company.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business, operations, and prospects so that the market price of the Company's stock would be based on truthful and accurate information.

95.      At all times relevant hereto, each Individual Defendant was the agent of each of the other Individual Defendants and of Netflix and was at all relevant times acting within the course and scope of such agency.

96.     To discharge their duties, the Individual Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Netflix.  By virtue of such duties, the Individual Defendants were, and are, required to, among other things:

a.     Exercise good faith to ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's certificate of incorporation and bylaws);

b.     Neither violate nor knowingly permit any officer, director, or employee of Netflix to violate any applicable laws, rules, or regulations;

c.     Remain informed as to the status of Netflix's operations, and upon receipt or notice of information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

d.     Establish and maintain systematic and accurate records and reports of the business and affairs of Netflix and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e.     Maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Netflix are conducted in accordance with all applicable laws, rules, and regulations; and

f.     Truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

**B.     Additional Duties of the Director Defendants**

97.     In addition to the duties discussed above with respect to all of the Individual Defendants, the Audit Committee Defendants owed specific duties to Netflix under the Audit Committee Charter ("Audit Charter").  Among other things, the Audit Charter charges the Audit Committee Defendants with the following authority and responsibilities, among others:

a.     The Committee reviews and discusses with management and the independent auditors the annual audited and quarterly unaudited financial statements and related disclosures included in the Company's quarterly earnings releases and in the Company's periodic reports on Form 10-K and 10-Q.

b.      The Committee discusses with management, the senior internal audit executive and the independent auditors the adequacy and effectiveness of the Company's disclosure controls and procedures, the adequacy and effectiveness of the Company's internal control over financial reporting, and the Company's risk assessment and risk management policies, including cybersecurity, legal and financial risks.

c.      Providing oversight and monitoring of the activities of Company management, including without limitation, the chief financial officer and principal accounting officer and controller, the Company's internal audit function and the independent auditors with respect to the Company's financial reporting and compliance process.

98.     While all Audit Committee Defendants must be "financially literate" in accordance with SEC and NASDAQ requirements, Defendant Mather was designated by the company as meeting the requirements of a "Financial Expert" as defined by SEC regulations.  Thus, she had all of the following attributes: (i) an understanding of GAAP and financial statements; (ii) an ability to assess the general application of such principles in connection with the accounting for estimates, accruals  and reserves; (iii) experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can be reasonably be expected to be raised by the registrant's financial statements or experience actively supervising one or more persons engaged in such activities; (iv) an understanding of internal controls and procedures for financial reporting; and (v) an understanding of all audit committee functions.

99.     While Defendant Mather was a "Financial Expert," each of the Audit Committee Defendants had extensive knowledge about financial matters due to their professional experience and/or service on public company boards.

## C.     Additional Duties of the Nominating and Governance Committee Defendants

100.    In addition to the duties discussed above with respect to all of the Individual Defendants, the Nominating and Governance Committee Defendants owed specific duties to Netflix under the Nominating and Corporate Governance Committee Charter ("NCG

Charter"). Among other things, the NCG Charter charges the Nominating and Corporate Governance Committee Defendants with the following authority and responsibilities, among others:

> a. The Committee recommends policies and procedures regarding corporate governance, and reports to the Board on corporate governance policies, practices and procedures.
>
> b. Recommend to the Board, as appropriate, policies, procedures and practices regarding corporate governance for the Company.
>
> c. Oversees the Board's self-evaluation process to help assure and enhance its performance, with a focus on, among other things, the Board's effectiveness.

## VI.     DAMAGES TO NETFLIX

101.    As a direct and proximate result of Defendants' misconduct, Netflix has suffered and continues to suffer significant harm, including, but not limited to:

> a. Legal and other costs incurred, and the distraction of, investigating and defending securities fraud class actions and insider trading investigations, as well as potentially billions of dollars in damages in connection with any settlement of or judgment in these lawsuits;
>
> b. Legal, accounting, regulatory and other costs incurred due to an increase in scrutiny of Netflix's statements concerning its projections and business outlook;
>
> c. The irreparable harm to the Company's reputation, loss of credibility, and loss of goodwill associated with the Company's failure to disclose problems that it knew or should have known that it had with subscriber retention, business expansion, subscription account sharing and financial outlook and the specter of insider trading;

d.      Costs incurred in connection with the Company's repurchases of its common stock at artificially inflated prices as a result of the material misstatements and omissions detailed herein; and

d.      Costs incurred from compensation and benefits paid to Defendants and other members of Netflix's management while they were engaged in the improper conduct alleged herein.

**VII.      CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

102.    In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

103.    During all times relevant hereto, Defendants, collectively and individually, initiated a course of conduct that was designed to and did, among other things, deceive the investing public including stockholders of Netflix.  In furtherance of this plan, conspiracy, and course of conduct, Defendants, collectively and individually, took the actions set forth herein.

104.    Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, Defendants caused and/or allowed the improper conduct described herein.

105.    The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' violations of state and federal law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and to conceal adverse information concerning the Company's business, operations, and future prospects.

106.    Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly engage in the improper conduct described herein.  Because Defendants' actions occurred under the authority of the Board, each Defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

107.    Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**VIII.        DERIVATIVE ALLEGATIONS**

108.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Netflix as a direct result of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants.

109.    Netflix is named as the nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

110.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in prosecuting this action.

111.    Due to the Board's direct involvement in the wrongdoing, its members' lack of independence, and the substantial likelihood of liability its members face, prosecution of this action independent of the Board is in the best interests of the Company and its stockholders.

### IX.   FUTILITY ALLEGATIONS

112.   Netflix's current Board consists of twelve (12) members, the Director Defendants. As shown above, despite having knowledge of facts and information which rendered its SEC filings and public statements false and/or misleading, Netflix failed to correct the same in a timely manner. Further, as set forth above, numerous insiders, with knowledge that the SEC filings and public statements described above were false and/or misleading, traded in Netflix stock at an inflated share price in dereliction of their duties of care and loyalty to Netflix shareholders.

113.   Plaintiff has not made any demand on the Board to institute this action because, for the reasons set forth herein, such a demand would be a futile and useless act.

### A.   Demand Is Excused as to Defendants Hastings and Sarandos Because They Lack Independence

114.   Defendants Hastings and Sarandos fall under the NASDAQ's definition of directors who are not independent. According to the NASDAQ's rules regarding listing, a director is not independent if he or she is, or has been within the last three years, an employee or an executive officer of the listed company.

115.   Because Hastings is Netflix's current Co-CEO and President of the Company, he may not be considered independent.

116.   Likewise, Defendant Sarandos may not be considered independent as he serves as the Co-CEO and Chief Content Creator of Netflix.

117.   The Company's 2022 Proxy Statement does not indicate that Defendants Hastings and Sarandos are "independent" as defined by the NASDAQ rules.

118.   Furthermore, Defendant Hastings is not independent because his principal professional occupation is his employment with Netflix.

119.   As President and Co-CEO of Netflix beginning in 1997, Defendant Hastings received significant compensation from the Company as described herein. Accordingly, Defendant

Hastings lacks independence from the other members of the Board due to his interest in maintaining his executive positions.

120.   In addition, Defendant Sarandos is not independent because his principal professional occupation is his employment with Netflix.

121.   As Chief Content Creator of Netflix since 2000 and Co-CEO of Netflix beginning in July 2020, Defendant Sarandos received significant compensation from the Company as described herein.  Accordingly, Defendant Sarandos lacks independence from the other members of the Board due to his interest in maintaining his executive positions.

122.   This lack of independence renders Defendants Hastings and Sarandos incapable of impartially considering a demand to commence and vigorously prosecute this action.

**B.      Demand is Excused as to Defendant Kilgore.**

123.   Defendant Kilgore served as the Chief Marketing Officer of Netflix from 2000-2012.

124.   During her time as Chief Marketing Officer, Defendant Kilgore worked closely with Defendants Hastings, Hoag, Hyman, and Peters.

125.   Defendant Kilgore's longstanding professional ties to Defendants Hastings, Hoag, Hyman, and Peters prevents the former from independently considering a demand.

126.   Further, during Defendant Kilgore's tenure, she oversaw conduct at the company similar to the misconduct at issue here involving account sharing and representations about continued growth in the number of paying subscribers.

127.   Accordingly, Defendant Kilgore is not disinterested.  The lack of independence renders Defendant Kilgore incapable of impartially considering a demand to commence and vigorously prosecute this action.

**C. Demand is Excused as to Defendant Smith.**

128.     Defendant Smith has been President and Chief Legal Officer of Microsoft since 2015, and he previously held high-level roles at Microsoft since 1993.

129.     Defendant Hastings joined was on Microsoft's Board of Directors from 2007 until 2013.

130.     Defendant Smith's role at Microsoft was subject to the oversight of the Microsoft Board of Directors, of which Defendant Hastings was a leading director. To the extent that Defendant Smith owed his continuing employment with Microsoft to Defendant Hastings and has close professional ties with Defendant Hastings, he cannot act independently because he remains beholden to Defendant Hastings. Therefore, Demand upon Defendant Smith is futile.

**D. Demand Is Excused Because the Director Defendants Face a Substantial Likelihood of Liability for Their Misconduct.**

131.     Each of the Director Defendants breached their fiduciary duties by, among other things:

a.      Failing to disclose known problems with its financial outlook and projections, given that of the over three hundred million households that utilized Netflix's streaming service approximately one hundred million, or almost **one third** were households who were using the passwords of other Netflix subscribers, thus substantially decreasing the likelihood that such households would purchase streaming services they were receiving at no cost.

b.      Failing to disclose the extent to which competition from other streaming services adversely affected the Company's financial outlook.

c.      Failing to maintain an adequate system of oversight and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

d.      Themselves affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings relating to the Company's operations and outlook.

e.      Defendants Reed, Saranos, and Neumann signed the Company's materially false and misleading 2020 10-K and 2021 10-K.

f.      Awarding Netflix's senior executives lavish compensation packages, despite their responsibility for the Company's willful misconduct.

132.    In Netflix's 2022 Proxy Statement, the current Board failed to disclose the known risks to the Company by Netflix's of streaming competition, post-pandemic forces, and shared accounts between households.

133.    Accordingly, the Director Defendants face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

134.    Additionally, the Audit Committee Defendants at all relevant times, had specifically defined duties to properly oversee: (i) the integrity of the Company's publicly reported financial statements, press releases, and guidance; (ii) its system of internal, financial, and administrative controls; and (iii) the Company's compliance with legal and regulatory requirements, including risk management policies and consumer privacy violation risks. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing and failing to correct the improper conduct detailed herein.

135.    For these reasons, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

136.    Additionally, the Nominating and Corporate Governance Defendants have extensive, high-level experience in corporate governance and business, making them very sophisticated board members. Three of the four Nominating and Corporate Governance

Defendants are founders of companies, and one is the president of a Fortune top 20 corporation. All have served on public company boards and/or are affiliated with other companies with subscription services and thus knew or should have known the problems that having a significant percentage of Netflix viewing households be the result of shared accounts, and thus non-paying customers, above and beyond their knowledge of Netflix.  Further, due to their experience, the Nominating and Corporate Governance Defendants know how critical the accuracy of public disclosures is, that it is vitally important that insiders do not trade shares on non-public knowledge, and that members of a board take immediate steps when improper or unlawful corporate conduct occurs.  Thus, the Nominating and Corporate Governance Defendants were responsible for knowingly or recklessly allowing and failing to correct the improper conduct detailed herein.

137.    For these reasons, the Nominating and Corporate Governance Defendants face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

138.    Defendants Neumann, Hastings, Sarandos and Peters are named as defendants in the related Securities Class Action, which alleges that they violated Sections 10(b) and 20(a) of the Exchange Act by affirmatively making false and/or misleading statements and cause members of the Class of the Securities Class Action to purchase Netflix's securities at an inflated price. These federal securities violations also constitute breaches of Defendants' fiduciary duties.

### E. Defendants Hoag, Mather, and Sarandos are Interested Based on Their Challenged Insider Sales.

139.    Defendants Hoag, Mather, and Sarandos are each directly interested based on their challenged, illicit insider sales, pursuant to which they received direct financial benefits not shared with all other Netflix shareholders, and they each are likewise interested based on a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith, and unjust enrichment as a result of their challenged stock sales.

140.    Based on their suspicious insider sales, pursuant to which they each received direct financial benefits not shared with all other Netflix shareholders, Defendants Hoag, Mather, and Sarandos are not disinterested directors and demand was not required of any of them.

141.    Therefore, any demand on these Director Defendants is futile.

**F.  Demand is Excused Because the Director Defendants Face Substantial Liability for Misstatements.**

142.    The Director Defendants executed a Power of Attorney handing over to Defendant Hastings and Defendant Neumann their authority and capacity to "…sign any and all amendments to [Netflix's Annual] Report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission…"

143.    As a result of that Power of Attorney, the Director Defendants face a substantial likelihood of liability for the misstatements in the Company's Annual Report for the years 2020 and 2021.

144.    Therefore, any demand on the Director Defendants would be futile.

**G.  Demand Is Excused for Additional Reasons**

145.    Demand is futile because the Board is dominated and controlled by Defendant Hastings because of his immense influence as founder of the company and long tenure as CEO and Chairperson.  Defendant Hasting built Netflix into one the largest subscription streaming entertainment companies in the world.

146.    Defendant Hastings has served as the Co-CEO and Chairperson of the Board since 1997.  He is undeniably the most influential, significant and wealthy individual at Netflix, with his net worth reported by Forbes to be more than $2 billion in 2022, and he ranks among the most influential and significant business leaders in the United States, if not the world. In 2020, Fortune rated Hastings as the fourth most important businessperson of the year, bested only by Elon Musk and two others. In 2021, Variety considered him one of the most influential entertainment leaders

and icons on the planet.  Defendant Hastings was one of the TIME 100 in 2021, which is a list of the individuals Time Magazine considers the most important people in the world.

147.   The Director Defendants are likewise conflicted and unable to pursue the Company's claims against the Officer Defendants.  Any effort to directly prosecute such claims against the Officer Defendants for their direct roles in the violations of applicable law carried out in Netflix's name would necessarily expose the Board's own culpability for the very same conduct.  In other words, given that the Board was required to be regularly informed concerning the Company's public reporting, outlook, controls, and employment decisions with respect to the Company's most senior officers, any effort by the Board to hold the Officer Defendants liable would lead the Officer Defendants to defend on the ground that their own conduct was consistent with corporate policy and practice, as established by and known to the Board.

148.   Moreover, the acts complained of constitute violations of the fiduciary duties owed by Netflix's officers and directors, and these acts are incapable of ratification.  Despite having knowledge of the claims and causes of action raised by Plaintiff, the Board has failed and refused to seek to recover on behalf of the Company for any of the wrongdoing alleged by Plaintiff herein.

**FIRST CAUSE OF ACTION**
**Breach of Fiduciary Duties**
**(Against the Officer Defendants)**

149.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

150.   The Officer Defendants owed fiduciary duties to Netflix and its stockholders.  By reason of their positions as fiduciaries to the Company, the Officer Defendants owed duties of good faith, loyalty, candor, and truthful disclosure.  In addition, the Officer Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Business Conduct and Ethics, and principles that, had they been discharged in accordance with

the Officer Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

151.    The Officer Defendants violated these duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.

152.    The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways: affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings relating to the Company's operations and financial outlook.

153.    As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, Netflix has sustained significant damages.  Accordingly, the Officer Defendants are liable to the Company.

154.    Plaintiff, on behalf of Netflix, has no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**Breach of Fiduciary Duties**
**(Against the Director Defendants)**

155.    Plaintiff incorporates by reference and realleges Paragraphs 1 through 148 above.

156.    The Director Defendants owed and owe Netflix fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Netflix the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance with state and federal privacy laws, rules, and regulations, as well as the duty of candor and truthful disclosure with respect to their public statements.

157.    The Director Defendants also owed and owe Netflix fiduciary duties under state corporation law, which impose broad obligations on Defendants vis-a-vis the corporation and its individual stockholders.

158.    In addition, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, and the charters of various Board committees, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

159.    Each Director Defendant violated his or her fiduciary duties by consciously causing, or consciously failing to prevent the Company from engaging in, the improper acts complained of herein.

160.    The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

a.      Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;

b.      Affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings relating to the Company's operations and financial outlook;

c.      Failing to ensure the Company's compliance with relevant legal and regulatory requirements, including, but not limited to, requirements imposed under privacy laws as well as state and federal securities laws;

d.      Awarding Netflix's senior executives lavish compensation packages, and paying the Officer Defendants substantial sums, despite their responsibility for the Company's willful misconduct;

e.      Causing Netflix to purchase $600 million of stock at prices artificially inflated by Defendants' conduct; and

f.      Reappointing the same directors who had failed in their duties to the Audit Committee.

161.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Netflix has sustained significant damages.  Accordingly, the Director Defendants are liable to the Company.

162.    Plaintiff, on behalf of Netflix, has no adequate remedy at law.

### THIRD CAUSE OF ACTION
**Breach of Fiduciary Duties for Insider Selling and Misappropriation of Company Information (Against the Insider Selling Defendants)**

163.    Plaintiff incorporates by reference and realleges Paragraphs 1 through 148 above.

164.    At the time the Insider Selling Defendants sold their Netflix stock, they were in possession of material, adverse, non-public information concerning the Company, and they sold their stock on the basis of that information.

165.    The material, adverse, non-public information at issue—which concerned the Company's financial condition, future business prospects, revenue growth, and the sufficiency of its Company's internal controls—was a proprietary asset belonging to the Company that must be used to benefit the Company and all its shareholders on equal terms. Instead, the Insider Selling Defendants misappropriated this information entirely for their own benefit.

166.    At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's financial condition, its future business prospects, and account sharing hindering Company growth.

167.    The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duty of loyalty and good faith.

168.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to

the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

169.    As a direct and proximate result of the Insider Selling Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

170.    Plaintiff, on behalf of Netflix, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**
**Waste of Corporate Assets**
**(Against the Individual Defendants)**

171.    Plaintiff incorporates by reference and realleges Paragraphs 1 through 148 above.

172.    As a result of the misconduct described above, Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

173.    Further, as a result of the failure to allow the Company to implement adequate internal and financial controls, the Individual Defendants have caused Netflix to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duties.

174.    In addition, Defendants have wasted corporate assets by causing Netflix to prepurchase $600 million of stock at prices artificially inflated by their misconduct.

175.    As a result of their waste of corporate assets, Defendants are liable to the Company.

176.    Plaintiff, on behalf of Netflix, has no adequate remedy at law.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
**(Against the Individual Defendants)**

177.    Plaintiff incorporates by reference and realleges Paragraphs 1 through 148 above.

178.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Netflix.  Defendants were unjustly enriched

because of the compensation and remuneration they received while breaching fiduciary duties owed to the Company.

179.    Plaintiff, as a stockholder and representative of Netflix, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, severance payments, and other compensation obtained by Defendants, and each of them, in connection with, from or at the time of their wrongful conduct and fiduciary breaches.

180.    Plaintiff, on behalf of Netflix, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.     Finding that a stockholder demand on the Netflix Board would have been a futile and useless act;

B.     Finding that Defendants have breached their fiduciary duties to the Company, wasted corporate assets, and were unjustly enriched;

C.     Against each Defendant in favor of Netflix for the amount of damages sustained by Netflix, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

D.     Requiring Defendants to return to Netflix all compensation and remuneration of whatever kind paid to them by the Company during the time that they were in breach of their fiduciary duties;

E.     Directing Netflix to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Netflix and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or

Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      A proposal to strengthen the Company's controls over accounting and financial reporting;

2.      A proposal to strengthen the Board's supervision of operations (including research & development along with third-party contracts) and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      A proposal to strengthen Netflix's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public;

4.      A provision to control insider selling and conflicts of interest;

5.      A provision to permit the stockholders of Netflix to nominate at least three candidates for election to the Board;

6.      A proposal to enhance and/or augment the audit, risk and compliance committees of the Board to oversee internal controls and compliance processes;

7.      A proposal to ensure that the Chief Compliance, Risk and Legal Officer(s) and other company leadership have (a) necessary subject matter and regulatory expertise; (b) direct reporting authority to the Board; and (c) adequate autonomy and resources to carry out their responsibilities;

8.      A proposal to review and implement revised codes of conduct, policies and procedures, training, integrity hotlines, auditing and monitoring processes and procedures;

9.      A proposal to review and implement the confidential reporting structure and investigative process of complaints within the company;

F.      Directing Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Netflix's directors, officers, and employees do not engage in wrongful or illegal practices;

G.      Granting additional appropriate equitable and/or injunctive relief to remedy Defendants' misconduct, as permitted by law;

H.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

I.      Granting such other and further relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

1    Dated:  July 14, 2022                         Respectfully submitted,

2

3
                                                   */s/ Azra Mehdi*
4                                                  AZRA MEHDI

5                                                  THE MEHDI FIRM, PC.
                                                   201 Mission Street, Suite 1200
6                                                  San Francisco, CA 94105
                                                   Telephone: (415) 293-8039
7                                                  Facsimile: (415) 432-4301
                                                   azram@themehdifirm.com
8
                                                   HERMAN JONES LLP
9                                                  John C. Herman (Ga. Bar No. 348370)
                                                   (to seek admission pro hac vice)
10                                                 Candace Smith (Ga. Bar No. 654910)
                                                   (to seek admission pro hac vice)
11                                                 3424 Peachtree Road, N.E., Suite 1650
                                                   Atlanta, Georgia 30326
12                                                 Telephone: (404) 504-6500
                                                   Facsimile: (404) 504-6501
13                                                 jherman@hermanjones.com
                                                   csmith@hermanjones.com
14
                                                   *Attorneys for Plaintiff Cori B. TARATOOT*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

I, CORI B. TARATOOT, hereby verify that I am familiar with the allegations in the Verified Stockholder Derivative Complaint ("Complaint"), and that I have authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this ____ 12 day of July, 2022.

DocuSigned by:

F1B1B9320F54407...

CORI B. TARATOOT